Espinoza v. Dimon

## UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2014

(Argued: April 1, 2015          Decided: June 16, 2015)

Docket No. 14-1754

_____

ERNESTO ESPINOZA, Derivatively on Behalf of JPMorgan Chase & Co.,

*Plaintiff-Appellant,*

—v.—

JAMES DIMON, DOUGLAS L. BRAUNSTEIN, MICHAEL J. CAVANAGH, ELLEN V. FUTTER, JAMES S. CROWN, DAVID M. COTE, LABAN P. JACKSON, JR., CRANDALL C. BOWLES, JAMES A. BELL, LEE R. RAYMOND, STEPHEN B. BURKE, WILLIAM C. WELDON, INA R. DREW, DAVID C. NOVAK,

*Defendants-Appellees,*

JPMORGAN CHASE & CO.,

*Nominal Defendant-Appellee,*

WILLIAM H. GRAY, III,

*Defendant.*

_____

B e f o r e:  KATZMANN, *Chief Judge*, POOLER and CARNEY, *Circuit Judges*.

_____

Appeal from the dismissal of a derivative action seeking to compel JPMorgan to take action against the corporate officers allegedly responsible for the recent "London Whale" trading losses, including several executives who disseminated misleading statements about those losses. At the outset, we conclude that our precedents compel us to review this dismissal only for abuse of discretion, although we express our view that the better approach would be to review the case de novo. Under this deferential standard, we conclude that the district court did not abuse its discretion by dismissing this action. Finally, we conclude that the district court did not err by denying the plaintiff an opportunity to amend his complaint.

_____

GEORGE C. AGUILAR (Jay N. Razzouk, *on the brief*), Robbins Arroyo LLP, San Diego, California; Thomas G. Amon, Law Offices of Thomas G. Amon, New York, New York, *for Plaintiff-Appellant*.

RICHARD C. PEPPERMAN, II, Sullivan & Cromwell LLP, New York, New York (Daryl A. Libow, Christopher Michael Viapiano, Sullivan & Cromwell LLP, Washington, D.C., *on the brief*), *for Defendants-Appellees* James Dimon, Douglas L. Braunstein, Michael J. Cavanagh, Ina R. Drew, and *Nominal Defendant-Appellee* JPMorgan Chase & Co.

Jonathan C. Dickey, Gibson, Dunn & Crutcher LLP, New York, New York, *for Defendants-Appellees* Ellen V. Futter, James S. Crown, David M. Cote, Laban P. Jackson, Jr., Crandall C. Bowles, James A. Bell, Lee R. Raymond, Stephen B. Burke, William C. Weldon, and David C. Novak.

_____

KATZMANN, *Chief Judge*:

This derivative action is one of many to arise out of the "London Whale" trading debacle, which cost JPMorgan Chase billions. Plaintiff-appellant Ernesto Espinoza, a JPMorgan shareholder, believes that JPMorgan has not done enough to go after those whom he deems responsible. Through this lawsuit, he seeks to compel JPMorgan to take action, up to and including suing the alleged wrongdoers. The district court (Daniels, *J.*) dismissed Espinoza's complaint, finding that he had not pleaded facts showing that the JPMorgan Board of Directors had wrongfully refused the demand for action.

We write principally to address a threshold issue in this case. A number of longstanding decisions in this Circuit hold that a district court's decision to dismiss a derivative action is reviewed only for abuse of discretion. But we believe this deferential review is not warranted: Reviewing the dismissal of a derivative action involves nothing more than reading the allegations in the complaint and deciding whether those allegations state a claim. No evidence is considered, no credibility determinations are made, and none of the other usual justifications for deferring to a district court are in play. Accordingly, we believe

that the abuse-of-discretion standard of review for the dismissal of derivative action cases should be retired, and that dismissals of derivative actions should be reviewed under the same de novo standard that we follow in all other similarly situated cases.

Until that standard is retired, however, we are bound to the rule of our Circuit. Under that rule, we conclude the district court did not abuse its discretion by dismissing this derivative action, and we therefore AFFIRM the judgment of the district court.

## BACKGROUND

Because the district court disposed of this case on a motion to dismiss, we assume the truth of the allegations in the plaintiff's complaint for purposes of this appeal. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). The following recitation of facts is thus adopted from Espinoza's complaint.

**A. The London Whale**

The London Whale story begins in JPMorgan's Chief Investment Office ("CIO"), which manages and invests the excess cash from JPMorgan's other businesses. J.A. 10. Before 2009, the CIO invested primarily in conservative

securities, with the goal of limiting JPMorgan's exposure to structural risks such as shifts in interest rates or foreign-exchange rates. J.A. 29. Beginning in 2008 and 2009, however, Defendant-Appellee Jamie Dimon, the Chief Executive Officer of JPMorgan, began transforming the CIO from a conservative risk-management unit into a more aggressive proprietary-trading desk, with the aim of generating additional profit. J.A. 30.

Seeking to satisfy this new emphasis on profits, the CIO began taking riskier positions in synthetic credit derivatives. In particular, a group of London traders led by Bruno Iksil—later known by the *nom de finance* "the London Whale"—made larger and larger bets in these markets. J.A. 32–33. But when these bets began to sour, the CIO doubled down by investing even more money in risky derivatives in an attempt to shore up these investments. J.A. 33–34. To conceal the losses, JPMorgan modified its "Variance at Risk" ("VaR") model in a way that gave the misleading impression that JPMorgan's overall risk had stayed constant; an unmodified VaR model would have shown that JPMorgan's risk had in fact doubled. J.A. 35. The model's modification was overseen and approved by Dimon.

As losses mounted, the markets and the press began to catch wind of JPMorgan's troubles. On April 6, 2012, *Bloomberg* reported that the CIO's positions in the credit derivative market had become so large that they were driving price moves in that market. J.A. 36. Shortly thereafter, Dimon, along with Defendant-Appellee Douglas Braunstein, JPMorgan's then-Chief Financial Officer, held a conference call with analysts and investors to discuss JPMorgan's earnings for the first quarter of 2012. During this conference call, Dimon and Braunstein repeatedly claimed that the CIO was conservatively investing in safe securities. J.A. 36–40. For example, Braunstein stated that "[w]e invest . . . in high grade, low-risk securities" and "[a]ll of [the CIO's investment] decisions are made on a very long-term basis . . . to keep the Company effectively balanced from a risk standpoint." J.A. 37–38. Similarly, Dimon characterized the mounting publicity over the CIO's losses as "a complete tempest in a teapot." J.A. 39.

But on May 10, 2012, JPMorgan was forced to reveal to investors the scale of the CIO's losses. J.A. 40. Dimon disclosed, for the first time, that JPMorgan had modified its VaR model to minimize the scale of the risks taken by the CIO. *Id.* Dimon acknowledged that the CIO's investments had been "flawed, complex,

poorly reviewed, poorly executed, and poorly monitored." J.A. 41. After all the dust settled, JPMorgan divulged that its total losses from the CIO exceeded $6.25 billion. J.A. 42. The debacle prompted a number of regulatory and Congressional investigations into JPMorgan's inadequate oversight of the CIO. J.A. 45–49.

**B. Espinoza's Demand and the Board's Investigation**

On May 23, 2012, Espinoza, a shareholder of JPMorgan, sent a letter to the JPMorgan Board of Directors demanding that the Board investigate the London Whale debacle. J.A. 51. This demand asked the Board to investigate (1) the failure of JPMorgan's risk-management policies, (2) the dissemination of false or misleading information about the scandal, and (3) the extent to which JPMorgan had repurchased stock at inflated prices due to the failure to disclose the losses. J.A. 69. Espinoza also demanded that, following the investigation, JPMorgan sue the responsible individuals and claw back previously-awarded salary and bonuses. J.A. 69–70. Espinoza also demanded that JPMorgan improve corporate governance and implement better risk controls. J.A. 70.

In response to Espinoza's demand, which was joined by similar demands from other JPMorgan shareholders, the JPMorgan Board established a "Review

Committee" composed of Defendants-Appellees Laban Jackson, Jr., Lee Raymond, and William Weldon, all members of the Board. J.A. 52–53. This committee would oversee JPMorgan's internal "Management Task Force," which had been assembled to investigate the London Whale debacle, and consider what actions, if any, JPMorgan should take in response. J.A. 53. The task force was led by Defendant-Appellee Michael Cavanagh. J.A. 54.

The Board rejected Espinoza's demand by letter dated February 5, 2013. J.A. 83–86. The letter outlined the Review Committee and task force's extensive investigation, which included (1) 22 interviews of current and former JPMorgan employees, (2) a review of roughly 300,000 documents, (3) meetings with regulators, (4) an analysis of relevant news reports, and (5) a survey of industry best practices. J.A. 83–84. The Board stated that, in its judgment, further litigation was not in the best interests of JPMorgan. J.A. 86. In support of this conclusion, the letter identified various remedial measures that had already been taken, including a revamp of the CIO leadership and mandate, improved risk controls, reduced salary for certain senior management and CIO personnel, clawbacks of previously awarded bonuses, and the departure or reassignment of certain

8

individuals involved in the debacle. J.A. 85. The Board also cited various factors that it weighed in deciding to not pursue litigation, including the cost of litigation, the low likelihood of success, the cost of bogging employees down in lawsuits, and the effect on employee morale. J.A. 85–86.

Espinoza then filed this lawsuit, arguing that his demand had been wrongfully refused. On March 31, 2014, the district court dismissed the complaint for failure to state a claim because the complaint did not show that the Board had failed to exercise appropriate business judgment in rejecting the demand. *See Espinoza v. Dimon*, No. 13-cv-2358, 2014 WL 1303507, at *7 (S.D.N.Y. Mar. 31, 2014). Although Espinoza asked for leave to amend if his complaint were dismissed, the district court did not grant leave to amend and instead entered judgment for the defendants immediately. *See id.*; Special App. 12–13.

**LEGAL FRAMEWORK**

**I.  Derivative Lawsuits**

"The derivative form of action permits an individual shareholder to bring 'suit to enforce a corporate cause of action against officers, directors, and third parties.'" *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 95 (1991) (quoting *Ross v.*

9

*Bernhard,* 396 U.S. 531, 534 (1970)) (emphasis omitted). "Devised as a suit in equity, the purpose of the derivative action [is] to place in the hands of the individual shareholder a means to protect the interests of the corporation from the misfeasance and malfeasance of 'faithless directors and managers.'" *Id.* (quoting *Cohen v. Beneficial Loan Corp.,* 337 U.S. 541, 548 (1949)).

"[A] shareholder seeking to assert a claim on behalf of the corporation must first exhaust intracorporate remedies by making a demand on the directors to obtain the action desired." *Scalisi v. Fund Asset Mgmt., L.P.,* 380 F.3d 133, 138 (2d Cir. 2004) (internal quotation marks omitted). If the board refuses the shareholder's demand, the derivative suit may proceed only if the shareholder shows that the board's refusal was "wrongful." *Abramowitz v. Posner,* 672 F.2d 1025, 1030 (2d Cir. 1982). Accordingly, Rule 23.1 of the Federal Rules of Civil Procedure requires a complaint in a derivative action to "state with particularity . . . any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and . . . the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3). Although Rule 23.1 sets forth the pleading standard for federal court,

the substance of the demand requirement is a function of state law—here, Delaware law. *See RCM Sec. Fund, Inc. v. Stanton,* 928 F.2d 1318, 1326 (2d Cir. 1991).

Under Delaware law, these allegations of wrongful refusal are reviewed under the business-judgment rule, which creates "a presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson v. Lewis,* 473 A.2d 805, 812 (Del. 1984), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del. 2000). Importantly, "[t]he ultimate conclusion of the [board] . . . is *not* subject to judicial review." *Spiegel v. Buntrock,* 571 A.2d 767, 778 (Del. 1990) (ellipsis in original) (quoting *Zapata Corp. v. Maldonado,* 430 A.2d 779, 787 (Del. 1981)). Instead, when evaluating wrongful refusal, "[t]he issues are solely the good faith and the reasonableness of the committee's investigation." *Id.* "[F]ew, if any, plaintiffs surmount [the] obstacle" of rebutting the presumption created by the business-judgment rule and showing that a demand was wrongfully refused. *RCM Sec. Fund, Inc.,* 928 F.2d at 1328.

## II.    Standard of Review

Ordinarily, we review dismissals de novo. *See, e.g.*, *Muto v. CBS Corp.*, 668 F.3d 53, 56 (2d Cir. 2012). But there is an exception to this general rule for derivative actions. In our Circuit, a line of cases dating back more than three decades has "held that determination of the sufficiency of allegations [under Rule 23.1] depends on the circumstances of the individual case and is within the discretion of the district court . . . [and] [c]onsequently, our standard of review is abuse of discretion." *Kaster v. Modification Sys., Inc.*, 731 F.2d 1014, 1018 (2d Cir. 1984); *see also Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983) ("[T]he decision as to whether a plaintiff's allegations of futility are sufficient to excuse demand depends on the particular facts of each case and lies within the discretion of the district court."); *Elfenbein v. Gulf & W. Indus., Inc.*, 590 F.2d 445, 450–51 (2d Cir. 1978) (per curiam). The holding of these older cases has been reiterated several times by more recent decisions. *See Halebian v. Berv*, 590 F.3d 195, 203 (2d Cir. 2009); *Scalisi*, 380 F.3d at 137. And at least five of our sister circuits join us in reviewing dismissals under Rule 23.1 only for abuse of discretion.[1]

---

[1] *See In re Silicon Graphics Inc. Sec. Litig.*, 183 F.3d 970, 983 (9th Cir. 1999), *abrogated on other grounds by S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776 (9th Cir. 2008); *Stepak v. Addison*, 20 F.3d 398,

12

Over the past few years, however, numerous courts have expressed doubts about reviewing Rule 23.1 dismissals for abuse of discretion rather than de novo. Seeing no reason to treat derivative actions differently than any other dismissed case, the First and Seventh Circuits recently adopted a de novo standard. *See Unión de Empleados de Muelles de Puerto Rico PRSSA Welfare Plan v. UBS Fin. Servs. Inc. of Puerto Rico*, 704 F.3d 155, 162 (1st Cir. 2013)[2]; *Westmoreland Cnty. Emp. Ret. Sys. v. Parkinson*, 727 F.3d 719, 724–25 (7th Cir. 2013). Judges in the Ninth and District of Columbia Circuits, although bound to abuse-of-discretion review by their precedents, have both questioned the wisdom of deferential review in this context. *See Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 n.2 (D.C. Cir. 2008) (Kavanaugh, *J.*) ("We tend to agree with plaintiffs that an abuse-of-discretion standard may not be logical in this kind of case . . . because the question whether demand is excused turns on the sufficiency of the complaint's allegations; and the legal sufficiency of

---

402 (11th Cir. 1994); *Garber v. Lego*, 11 F.3d 1197, 1200 (3d Cir. 1993); *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68 n.10 (D.C. Cir. 1988); *deHaas v. Empire Petroleum Co.*, 435 F.2d 1223, 1228 (10th Cir. 1970).

[2] The Supreme Court granted certiorari in *Unión de Empleados* to resolve the circuit split over the proper standard of review, *see* 133 S. Ct. 2857 (2013), but dismissed the case after the parties settled, *see* 134 S. Ct. 40 (2013).

a complaint's allegations is a question of law we typically review de novo.");

*Rosenbloom v. Pyott*, 765 F.3d 1137, 1159–60 (9th Cir. 2014) (Reinhardt, *J.*, concurring). The Delaware Supreme Court, known for its corporate law jurisprudence, expressly discarded abuse-of-discretion review of dismissals under the substantively identical Delaware Chancery Court Rule 23.1. *See Brehm v. Eisner*, 746 A.2d 244, 253–54 (Del. 2000).[3] Last but not least, several decisions in our Circuit have voiced puzzlement over the abuse-of-discretion holdings of *Kaster*, *Lewis*, and *Elfenbein*. *See Scalisi*, 380 F.3d at 137 n.6; *see also Gamoran v. Neuberger Berman LLC*, 536 F. App'x 155, 157 (2d Cir. 2013); *Kautz v. Sugarman*, 456 F. App'x 16, 18 (2d Cir. 2011).

We now add our panel's voice to the chorus of courts endorsing de novo review of dismissals under Rule 23.1. In our view, the time is at hand for the abuse-of-discretion standard to be retired, and for us to apply the same de novo standard to the Rule 23.1 context that we apply when reviewing all other dismissals. We hold to this view for three reasons.

---

[3] Following Delaware's *Brehm* decision, several other state courts have also endorsed de novo review of dismissals of derivative actions. *See, e.g.*, *In re PSE & G S'holder Litig.*, 801 A.2d 295, 313 (N.J. 2002); *Harhen v. Brown*, 730 N.E.2d 859, 866 (Mass. 2000).

First, none of the usual justifications for deferring to district courts are present here. On this point, we have little to add to the Delaware Supreme Court's analysis in *Brehm*:

> The nature of our analysis of a complaint in a derivative suit is the same as that applied by the [lower court] in making its decision in the first instance. Analyzing a pleading for legal sufficiency is not, for example, the equivalent of the deferential review of certain discretionary rulings, such as: an administrative agency's findings of fact; a trial judge's evaluation of witness credibility; . . . a decision whether to grant or deny injunctive relief or the scope of that relief; or what rate of interest to apply. In a Rule 23.1 determination of pleading sufficiency, the [lower court], like this Court, is merely reading the English language of a pleading and applying to that pleading statutes, case law and Rule 23.1 requirements.

746 A.2d at 253–54 (footnotes omitted)*; see also Rosenbloom*, 765 F.3d at 1160 (Reinhardt, *J.*, concurring) ("Nothing in Rule 23.1 indicates a preference for district court decision-making; doctrines of demand futility are reasonably uniform and amenable to general rules that cover a wide range of circumstances; . . . and district courts do not have an institutional advantage over appellate courts in determining the legal sufficiency of pleadings.").

Second, abuse-of-discretion review is more than just unwarranted—it is illogical. In the ordinary case, the "abuse-of-discretion standard incorporates *de novo* review of questions of law . . . and clear-error review of questions of fact."

15

*United States v. Legros*, 529 F.3d 470, 474 (2d Cir. 2008). Consistent with this understanding, our decisions in *Scalisi* and *Halebian*, after reciting our abuse-of-discretion standard for dismissals under Rule 23.1, went on to assert that "where a challenge is made to the legal precepts applied by the district court in making a discretionary determination, plenary review of the district court's choice and interpretation of those legal precepts is appropriate." *Scalisi*, 380 F.3d at 137; *Halebian*, 590 F.3d at 203. On a motion to dismiss, however, there can be only questions of law; any questions of fact drop out because we "accept[] all factual allegations in the complaint as true, and draw[] all reasonable inferences in the plaintiff's favor." *City of Pontiac Gen. Emps.' Ret. Sys. v. MBIA, Inc.*, 637 F.3d 169, 173 (2d Cir. 2011) (internal quotation marks omitted). Because a district court makes a purely legal determination in dismissing a complaint under Rule 23.1, any challenge to that dismissal is necessarily a challenge to "legal precepts" that, were we to follow the normal rules for abuse-of-discretion review, would be reviewed de novo. Abuse-of-discretion review for dismissals should thus collapse into purely de novo review. And yet every decision to apply the abuse-of-discretion review to derivative actions has treated it as distinct from de novo

16

review, and as requiring deference to the legal reasoning of the district court. In short, such deference cannot be reconciled with our ordinary understanding of abuse-of-discretion review as encompassing de novo review of issues of law.

Finally, abuse-of-discretion review could destabilize the law of derivative actions. Deferring to a district court's discretion implies that the district court could have reached multiple acceptable outcomes. *See Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168–69 (2d Cir. 2001) ("When a district court is vested with discretion as to a certain matter, it is not required by law to make a *particular* decision. Rather, the district court is empowered to make a decision—of *its* choosing—that falls within a range of permissible decisions."). In other words, one district court could conclude that a derivative complaint should be dismissed, whereas another, reviewing the exact same complaint, could properly conclude that identical allegations were legally sufficient under Rule 23.1. Under abuse-of-discretion review, both decisions would be acceptable, and both would be affirmed on appeal. Permitting such divergent results does a disservice to shareholders and corporate boards alike by depriving them of clear rules to guide the management of corporate affairs. And not only do we risk introducing

17

ambiguity into our own decisions, but here we also risk injecting confusion into state corporate law.[4]

For these reasons, we believe that the time has come to join the growing number of courts that have discarded abuse-of-discretion review of Rule 23.1 dismissals. And yet, the current rule of our Circuit remains abuse-of-discretion review, and so, absent intervention by the Supreme Court or this Court acting en banc, that rule governs us here. *See Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 405 (2d Cir. 2014). Accordingly, we review the district court's dismissal of this action for abuse of discretion.[5]

---

[4] In questioning the propriety of abuse-of-discretion review in this context, we mean no criticism of deferential review generally. Deferential review is an essential pillar of judicial decisionmaking. Many decisions—assessments of credibility, case management, and sentencing, to name only a few—are properly vouchsafed to the sound discretion of our able district judges. But these decisions are all judgment calls about which different minds could reasonably disagree. The legal sufficiency of a complaint, by contrast, is a pure question of law, and therefore should have, in the final analysis, but a single correct answer.

[5] We decline the appellees' invitation to decide this case in the alternative by affirming the district court under both standards of review. We thus express no view on how this case should be decided under a more stringent de novo review.

**DISCUSSION**

## I. JP Morgan's Refusal of Espinoza's Demand

At its heart, this suit challenges the scope of JPMorgan's investigation into the London Whale debacle. Espinoza's demand letter asked the JPMorgan Board to investigate and take action based on two related facets of the London Whale fiasco: (1) the underlying trading losses, which cost JPMorgan billions, and (2) the alleged dissemination of misleading statements by Dimon and others. Espinoza concedes that the Board adequately investigated the underlying trading losses, and although he disagrees with the Board's decision to not take more aggressive action against those responsible, he recognizes, as he must, that Delaware law protects the Board's decision so long as it was based on an adequate investigation.

But Espinoza does not concede that the Board adequately investigated the misleading statements. Both Espinoza's demand letter and his complaint attack public statements that minimized the scale of the London Whale losses, placing special focus on Dimon's statement in April 2012 that the media's attention to the losses was "a complete tempest in a teapot." J.A. 39. Espinoza alleges that these misstatements cost JPMorgan dearly, both by exposing JPMorgan to litigation and

regulatory liability and by inflating the JPMorgan share price at a time when the corporation was repurchasing stock. Accordingly, Espinoza's demand letter requested that the Board "determine which Company employees, officers, and/or directors, current or former, were responsible for dissemination of the materially false/misleading statements and omissions regarding the risk exposure." J.A. 69.

Despite this demand, Espinoza contends that the Review Committee and task force's investigation focused solely on the substantive trading losses, rather than the misleading statements about those losses. For example, the complaint alleges that "the Task Force did not investigate the improper statements discussed herein, which masked the CIO's troubled trading position and mounting losses from regulators and investors." J.A. 54; *see also* J.A. 56–57 ("[T]he Review Committee's investigation was limited in its scope. . . . [T]he Review Committee never even evaluated potential liability for certain of the defendants' false and misleading statements."). Consistent with this alleged failure to investigate the misstatements, the Board's response to Espinoza's demand letter makes no mention of the misstatements, and in fact characterizes the demand as solely

20

"relating to the losses suffered by the Company's Chief Investment Office." J.A. 83.

Based on these allegations, Espinoza challenges the district court's deferential stance toward the Board's investigation. Put simply, if the Board never investigated the misstatements, then there was never any exercise of "judgment" that could be presumed reasonable. *See Rich ex rel. Fuqi Int'l, Inc. v. Yu Kwai Chong*, 66 A.3d 963, 979 (Del. Ch. 2013) ("[T]he business judgment rule has no role where directors have either abdicated their functions, or absent a conscious decision, failed to act." (internal quotation marks omitted)). As such, Espinoza urges that the Board's decision to not pursue action against Dimon or others was, contrary to the conclusion reached by the district court, unprotected by the business-judgment rule.

Somewhat surprisingly, Delaware law does not squarely address Espinoza's "scope" argument. None of the parties have uncovered any case in which a shareholder demanded that a board look into two related yet distinct matters and the board investigated only one of those matters before refusing the entire demand. Our own independent review likewise came up empty. In the

absence of more direct guidance, then, our analysis is informed by general principles of Delaware corporate law. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir. 1994). Delaware law is clear that "to invoke the [business-judgment] rule's protection[,] directors have a duty to inform themselves, prior to making a business decision, of all material information reasonably available to them." *Aronson*, 473 A.2d at 812; *see also Brehm*, 746 A.2d at 259 (framing the inquiry as whether "particularized facts in the complaint create a reasonable doubt that the informational component of the directors' decisionmaking process, measured by concepts of gross negligence, included consideration of all material information reasonably available" (emphasis omitted)).

But even though a corporate board must investigate before refusing a demand, Delaware law affords directors substantial leeway over how to conduct that investigation. Delaware courts routinely reject derivative lawsuits that quibble over the exact form of an investigation. *See, e.g.*, *Levine v. Smith*, 591 A.2d 194, 214 (Del. 1991) ("While a board of directors has a duty to act on an informed basis in responding to a demand . . . , there is obviously no prescribed procedure that a board must follow."), *overruled on other grounds by Brehm*, 746 A.2d 244;

22

*Mount Moriah Cemetery ex rel. Dun & Bradstreet Corp. v. Moritz*, 1991 WL 50149, at *4 (Del. Ch. Apr. 4, 1991) ("In any investigation, the choice of people to interview or documents to review is one on which reasonable minds may differ. . . . Inevitably, there will be potential witnesses, documents and other leads that the investigator will decide not to pursue. That decision will not be second guessed by this Court on the showing made here."). The appellees particularly stress an unpublished Delaware Chancery Court decision, *Baron v. Siff*, which explained that even if a response to a demand "fail[s] to contain a point-by-point response to all allegations in the demand letter," such failure "does not stand for the proposition that the Board did not consider the demand before refusing it." 1997 WL 666973, at *3 (Del. Ch. Oct. 17, 1997).

Distilling these various holdings, we frame the inquiry here as whether the JPMorgan Board committed "gross negligence," *Brehm*, 746 A.2d at 259, by focusing its investigation on the trading losses rather than the misstatements. Once the inquiry is framed in this way, however, the outcome is essentially dictated by our deferential standard of review. For Espinoza to prevail on appeal, we would need to find that the district court abused its discretion by concluding

that the Board's focus on the trading losses rather than the misstatements was not grossly negligent. In other words, reversal would require us to second-guess the district court's decision not to second-guess the JPMorgan Board.

This we cannot do. Although Espinoza's demand letter included allegations about both the losses and the misstatements, the thrust of the demand focused on the trading losses rather than the misstatements. Of six topics outlined for investigation in the demand letter, only one focused on the alleged misstatements. The misstatements came to the fore of the case only after the Board concluded its investigation and allegedly devoted insufficient attention to the misstatements. For all the other topics raised by the demand letter— inadequate risk controls, inadequate oversight, the losses themselves, and more— the Board's investigation went, in the words of the district court, "far beyond what was necessary to provide the Board with 'an informed basis for rejecting the derivative plaintiff's demand.'" *Espinoza*, 2014 WL 1303507, at *6 (quoting *In re Boston Scientific Corp. S'holders Litig.*, No. 02-cv-247, 2007 WL 1696995, at *5 (S.D.N.Y. June 13, 2007)). In light of the "presumption that in making a business decision the directors of a corporation acted on an informed basis, in good faith

24

and in the honest belief that the action taken was in the best interests of the company," *Aronson*, 473 A.2d at 812, the district court could reasonably conclude that the Board's decision to focus on the crux of Espinoza's demand—even at the expense of covering every topic raised in the demand letter—did not rise to the level of gross negligence. Accordingly, we find that the district court did not abuse its discretion by dismissing this action under Rule 23.1.[6]

---

[6] In addition to his primary "scope" argument, Espinoza also mounts a few secondary arguments, which we dispose of summarily. As an initial matter, Espinoza has waived these arguments, having raised them in perfunctory fashion in a single sentence. *See Tolbert v. Queens Coll.*, 242 F.3d 58, 75 (2d Cir. 2001) ("It is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation marks omitted).

Yet, even if we exercised our discretion to consider these arguments, we would find them meritless. First, Espinoza alleges that the investigation "disregard[ed] . . . defendant Dimon's responsibility for secretly transforming the CIO from a risk management unit to a proprietary trading desk." Appellant's Br. 44. This allegation fails because it challenges the Board's "ultimate conclusion," rather than the adequacy of its investigation. *Spiegel*, 571 A.2d at 778. Second, Espinoza criticizes "the unreasonably narrow time period of wrongdoing investigated." Appellant's Br. 44. This criticism focuses on the manner of the investigation, and does not suggest that the Board's investigation was grossly negligent. *Cf. Mount Moriah Cemetery*, 1991 WL 50149, at *3 (explaining that an investigation's "fail[ure] to review any documents created prior to 1985" did not make that investigation grossly negligent).

Finally, Espinoza attacks "the lack of independence on [the] part of the Review Committee and the Task Force, led by defendant Dimon's close confidant defendant Cavanagh." Appellant's Br. 44. While a plaintiff who makes a pre-suit demand generally concedes the independence and disinterestedness of the board, *see Levine*, 591 A.2d at

25

## II.    Leave to Amend

Finally, Espinoza argues that he should have been given at least one opportunity to amend his complaint. In his opposition to the motion to dismiss, Espinoza requested that the district court, if it chose to dismiss the complaint, allow him to amend it by adding fresh allegations. The district court, however, dismissed the complaint and entered judgment for the defendants, Special App. 12–13, without explicitly addressing Espinoza's request to amend. *See In re Tamoxifen Citrate Antitrust Litig.*, 466 F.3d 187, 220 (2d Cir. 2006) (explaining that a court may "deny leave to amend implicitly by not addressing the request when leave is requested informally in a brief filed in opposition to a motion to dismiss"), *abrogated on other grounds by F.T.C. v. Actavis, Inc.*, 133 S. Ct. 2223 (2013).

---

212, "[i]f there is reason to doubt that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal," *Grimes v. Donald*, 673 A.2d 1207, 1219 (Del. 1996), *overruled on other grounds by Brehm*, 746 A.2d 244. Here, however, the district court concluded that Espinoza's allegations regarding the Board's independence were insufficient to call the Board's exercise of business judgment into question. *See Espinoza*, 2014 WL 1303507, at *5 & n.6. Espinoza has failed to explain why this conclusion constitutes an abuse of discretion.

Rule 15 of the Federal Rules of Civil Procedure instructs that leave to amend should be "freely give[n] . . . when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave to amend need not be granted, however, where the proposed amendment would be futile." *Advanced Magnetics, Inc. v. Bayfront Partners, Inc.*, 106 F.3d 11, 18 (2d Cir. 1997) (internal quotation marks and alterations omitted). Here, we conclude that any amendment would have been futile because Espinoza fails to identify additional allegations that would fix the problem with his first complaint. Almost all of the new allegations that he proposes to add to an amended complaint relate to the London Whale debacle, rather than to the Board's investigation. But the gravity of the underlying failure does not bear on whether the Board's refusal of the demand was adequately informed. Other proposed allegations focus on Cavanagh's lack of independence and conflicts of interest within the Review Committee and task force. To be sure, "[i]f there is reason to doubt that the board acted independently or with due care in responding to the demand, the stockholder may have the basis *ex post* to claim wrongful refusal." *Grimes*, 673 A.2d at 1219. However, the new allegations identified by Espinoza regarding Cavanagh's lack of independence simply

27

reiterate those already rejected by the district court as insufficient to call the Board's exercise of business judgment into question. J.A. 543 & n.24. The remaining additional allegation—that Dimon and Robert Mundheim, the outside counsel retained by the Review Committee, both worked at the same company in 1998, J.A. 543 & n.25—is insufficient, standing alone, to overcome the presumption of the business judgment rule.

The closest that Espinoza comes to proposing a non-futile amendment are new allegations based on the minutes of the Board's discussion of the demand, which became available only after Espinoza filed his complaint. Espinoza argues that these minutes "fail[] to reflect actual consideration of the improper statements issue, but rather focus exclusively on the issue of the CIO's losses." Appellant's Reply Br. 22. Unlike the other new allegations proffered by Espinoza, the Board's minutes bear directly on the adequacy of the Board's investigation, and thus go to the defect in the initial complaint. But even if the more prudent course would have been to permit amendment to add allegations about the minutes, we ultimately conclude that even this amendment would have been futile. The Board's minutes, at most, would allow Espinoza to plead more

detailed allegations showing that the Board failed to consider the alleged misstatements. But the district court did not dismiss Espinoza's original complaint for lack of allegations that the Board's investigation ignored the improper statements. To the contrary, the original complaint was replete with allegations about the narrowness of the investigation. Instead, the district court found that, even assuming that the Board's investigation focused solely on the trading losses rather than the misstatements, such a focus was not grossly negligent. *See Espinoza*, 2014 WL 1303507, at *6 ("The Task Force's focus is not evidence that the Review Committee was grossly negligent or that the Board acted in bad faith."). Padding the complaint with additional allegations about how the Board failed to investigate the misstatements would thus do nothing to cure the deficiency identified by the district court. Accordingly, the district court did not err by implicitly denying Espinoza leave to amend his complaint.

## CONCLUSION

For the foregoing reasons, we conclude that the district court did not abuse its discretion by dismissing the complaint. Accordingly, we AFFIRM the district court's grant of the motion to dismiss. Moreover, because Espinoza failed to

29

identify new allegations that fix the problem with his original complaint, we

AFFIRM the district court's decision to implicitly deny leave to amend.